Good morning, Your Honor. My name is William Weiner. I represent Petitioner Tommy Runnell. The major issue in this case is the trial counsel's failure to garner the facts and argue the attenuation analysis in Brown v. Illinois that has been argued as successfully and used by this Court many times. My brief statement is that the trial counsel's failure to garner the facts and argue the attenuation analysis in Brown v. Illinois that has been argued as successfully and used by this Court many times. My brief statement is that the trial counsel's failure to garner the facts and argue the   failure to garner the facts and argue the attenuation analysis in Brown v. Illinois that has been argued as successfully and used by this Court many times. As you see from my briefs, every single time was, please give me more time to prepare for this trial because I'm in another trial. And actually, he was denied that preparation. Trial took place some five days after he was completed with his pending trial.  The facts were out there, but he didn't bring them in terms of the argument. We know it was an invasion by six police officers, 5 a.m. without a warrant, without probable cause, no exigent circumstances. That's clear. Every side actually concedes that. Guns were drawn, ten people. Everybody was put down in the living room. All the males were handcuffed. Rickman, the Oakland police officer, seizes a .25 caliber pistol from Petitioner's person's bedroom to arrest Petitioner, takes him out of the house. Petitioner's taken away. Rickman observes black gloves, a black jacket, and a black ski mask, which a lady used in trial against Petitioner. He doesn't move them. Vieira, another police officer, again in on the illegal entry, observed Petitioner put a something under a mattress. Rickman spots that, picks it up, sees it under the mattress, also spots ammunitions, another issue. These are introduced at trial later as well. What trial counsel missed is that was all done before Mercado arrived. Mercado, remember, was at a gym taking a shower. He took 30 to 45 minutes to arrive. And then what happened, in terms of the continuation of the violation, is all people are still restrained because of the illegal entry, and Mercado literally, this is literally the case, confronts Pitts with the illegal .25 caliber pistol that's been obtained. He doesn't say, can I have consent? He said, we found this .25 caliber pistol. She says, well, in that case, go ahead and search. In terms of the court's general analysis of this issue, what's the proximity? Well, we have some factual determinations made by the judge here on the consent issue, don't we? We do have factual determinations by the judge. I agree, we do have them. Aren't they entitled to a certain amount of deference? Well, you know, here's the interesting part on that, Your Honor, and I'll be very frank with what happened with trial counsel. He just missed everything. What the trial court said, aside from saying that the consent was proper, the trial court said this. It's on 43 of my brief, if you want to follow me. He says, the .25 caliber pistol suppressed because of the illegal entry. And then he said, and I'm quoting this here, it's very short, and any other evidence seized as a result of the observations of officers Rickman and Midget. They observed the black gloves, the black mask, the black jacket. They observed the rifle under the mattress. They froze them, according to Mercado. They froze them because they wanted a technician to come in for fingerprints, and they wanted a photographer to come in to show where they were found because they'd be used at the Hays trial, which indeed they were. They picked up the .25 caliber pistol because plaintiffs shouldn't have, pardon me, petitioners shouldn't have had that, and they arrested him for it. But everything else was frozen. This should have been tossed out. What prosecutors said to that is, well, it was only the .25 caliber pistol that was seized. But the facts, the transcript itself belies that. Trial counsel was numb. He did nothing. He argued nothing. He didn't know anything. He didn't even argue about the second rifle, which clearly should have been suppressed. This counsel knew nothing except he was in the midst of trial. If you go on what Your Honor is saying, that should we look at the trial court and what the trial court did? Okay, the second rifle was found. They had a search warrant, correct? No, they did not have a search warrant, Your Honor. They had no search warrant. They had an arrest warrant for a person that didn't live there, and Mercado nonetheless said go in. And actually, he was unapologetic. Part of the three-part attenuation test and the important part is the flagrancy of the violation. They went in, guns drawn and so forth, no warrant whatsoever, certainly nothing. The second went out the window, too, right? That's right. My client went out of the window when they came in. It's not illegal to go out the window. And he did that, of course, in response to their illegal entry. And Mercado was unapologetic. They didn't send me to law school, Your Honor. That was his response. He doesn't care about the Fourth Amendment. This is the most flagrant violation that you could possibly imagine. And trial counsel didn't garner the facts and didn't even understand counsel the trial court's ruling. The trial court's ruling was actually favorable to him. He should have said, look what they found that should have been suppressed. He didn't. We had a trial that took place that shouldn't have had this information. It would have been an entirely different trial. Enoch would have been the murderer and probably was. It's absolutely astonishing. That's all trial counsel did. There's no argument in terms of this court's attenuation analysis. There's no bringing forth of the facts. Trial counsel said nothing. Do you want to do anything? I have no comment. He actually said, I don't know how to respond. That's all he did. He was involved in another case. His head was entirely somewhere else except to argue, please give me more time so I can get on these facts. That's the case that you have before you, Your Honor. Now, did the government – I'm not really sure. Did the government concede that the – that on the illegal entry, on the first, did the government concede that? They didn't argue against it. Nobody argued against it. It was so clear. Did they concede it? Did they concede it? I would say no. They put on evidence, so they didn't concede it. But they didn't argue against it. When the judge says my tentative ruling is there was an illegal entry, everybody said, sure, let's suppress the .25 caliber. So I don't know how to quite answer. I'm sorry to fudge on that. But they put on evidence. But I think the evidence was put on to try to get other things in. Everybody was clear. I mean, everybody said there was no search warrant. There's no reason for us to admit there was no executive circumstances. Nobody testified otherwise. There's no information otherwise. So in that case, it was a concession. But, yes, evidence was put on. Do we have to accept? All right. The district court found that he do we have to accept that fact of the district court? What fact? I'm sorry. That the suppression of the first weapon, do we have to accept that for these purposes? I'm sorry. I still don't understand what you're getting at, Judge. Well, that the illegal entrance, do we have to accept that fact? Oh, I think absolutely. Everyone's conceded that. Every judge has decided that. The trial court judge decided that. The DCA decided that in California. And the district court judge decided that. There's no question about that. Actually, just read the transcript. There's clearly no question about it. They just came in at 5 in the morning without any reason. It's like going into your house to search for arrest for somebody else. I mean, that part is absolutely clear. No one has said otherwise. The briefs don't say otherwise. No one has said otherwise. Do you want to save any time for rebuttal? Yes, thank you. Okay. Thank you. Thank you. Any other questions? Okay. May it please the Court, Peggy Ruffray for Respondent. Your Honor, what actually happened in this case at the suppression hearing is not what you've been led to believe. And I noticed when I was reading the suppression hearing last night that it's in this transcript and neither party presented this transcript, the entire transcript, to the Court. I think it might be very helpful, and I'd be happy to prepare supplemental excerpts of record if the Court wishes. There's only a page or two here and there from the suppression hearing that is currently in the excerpts of record. And when you read the entire suppression hearing ---- And it's under the better light than never? Yes, yes. And I just came into the case recently, read this last night, and I think that it is helpful if the Court wants me to do it. And what is revealed when you read the suppression hearing, where I believe either four or five officers who were involved in this testified, is that the rifle was not found until after the consent was given. And that's the reason that the trial attorney never raised any issue about it. It was very clear on this record that they first saw, they entered, they saw the pistol in plain sight on the bed. That was, in fact, suppressed as a result of the illegal entry. Then what happened, they called Sergeant Mercado, who was the investigating officer for this case. He was at the Oakland Athletic Club shaving and showering. He came 45 minutes later, and nothing happened during that period of time. Every officer says that we did nothing further in that room until Sergeant Mercado came. Then he talked to the person whose name was on the lease, Denise Pitts. She gave voluntary consent. Even the defense investigator's report, which is in the record at ER 240, the defense investigator talked to Ms. Pitts, and she said, I was not coerced. It was totally voluntary. So that has really never been at issue, and it is a factual finding by the state trial court as well. And she was not under arrest. The officer spoke to her 45 minutes later. It was in private, and it was a different officer than the one who illegally entered. She voluntarily gave consent, and only then did they go and search the room. Illegal entry? Yes. The state court found that there was an illegal entry, and we are not conceding that. Under the Payton case. You're not contesting it. I'm sorry. We're not contesting it. Under the Payton case. So it's clear that only after Ms. Pitts gave her voluntary consent, which was attenuated from the initial illegal entry, then they went into the room, they searched, they found all these items, including the rifle that was used in the murder. So based on that factual scenario, there was no reason for the trial attorney to raise some issue about that, because everybody in the courtroom understood that that was the sequence of events. And there's been no evidence to suggest that that was not the sequence of events. Isn't that what the court of appeals expressly stated in explaining why it was not ineffective assistance of counsel to fail to argue about the first gun? Well, I don't think that this particular issue was really raised in the court of appeal, the issue of whether the rifle was found before or after consent. That's a new theory. And it's our position that the reason it's a new theory is because it's not, in fact, supported by any of the evidence that came out of the suppression hearing. But what the court of appeal did find was the main issue that was litigated at the motion to suppress and then on appeal was whether the consent was attenuated, sufficiently attenuated. And that's what the court of appeal reasonably found, that since it was 45 minutes later, it was the person who was not under arrest, she was happy to give her consent because she said, I've told those boys not to have any guns or drugs in the room. That's part of my lease. And if that happens, then we could all get kicked out. So she frequently went through the apartment to make sure that nobody had anything illegal there that could jeopardize her tenancy. Ms. Ramsey doesn't argue in his habeas about the illegality of the failure to argue the first. I mean, that issue is not really before us. But as you explained, the other is before us. And the court of appeals did explain it expressly. Yes. Why it was okay. Exactly. They found that the consent sufficiently was attenuated from the initially illegal entry. So everything that was seized after that was properly admitted. And so, again, the only thing that was seized before the consent was this pistol, which was suppressed. So. Is there a difference between when it was seized and when it was discovered? A lot of this evidence, according to Mr. Weiner, a lot of this evidence was discovered by officers before the landlady gave consent to search. And that's what I'm saying is not, in fact, borne out by the record, if you read the suppression hearing. The officers, when Mr. Ramsey was trying to flee out the window, they saw him lift up his mattress. They didn't see what he did with it, what he put under it or anything. But they. Well, a cop would assume he stuck something under it. Absolutely. And I think they even said, even if we hadn't seen it, we would have searched under the mattress when we eventually did search the room pursuant to consent. But the point is that they didn't do anything to search further until Sergeant Mercado got there and obtained consent from the owner. So they didn't know what was in the room other than the pistol that was in plain sight and that was suppressed. That was the only thing in plain sight when she gave her consent? Correct. Everything else was found after she consented. And so that's the reason why this trial attorney didn't raise that as an issue. And I think it's clear that everyone in the courtroom understood that was the sequence of events. And so there was no reason to suggest that they were seized prior to the consent. And certainly, Mr. Ramsey didn't testify at his suppression hearing. He didn't suggest a different factual scenario. So for all those reasons, it wasn't unreasonable for the State court in this case to find no ineffective assistance of counsel. Did the State courts ever consider whether the subsequent discovery was tainted by the illegal entry, which the illegal entry produced the pistol that was suppressed? Correct. And so then the lady said, okay, you found this pistol and we have a rule against guns in the house, so sure, go ahead and search. Is that ñ is there any ñ would anybody raise any question of the poison tree in that? Yes. That was raised by the trial attorney at the suppression hearing. That was one of the main issues that the trial court ruled on. The trial court actually found sufficient attenuation. And then that was raised on direct appeal. The court of appeal, again, found sufficient attenuation. So that issue was squarely considered and decided by the State courts. Did you ever argue any theory that the first gun could have come in just because the consent would have found it anyway? Did you ever argue that theory? Did ñ do you mean did the prosecution at the trial ñ Yes. I don't think that was ever raised. I think it is true that everybody seemed to ñ not necessarily concede, but it wasn't really ever in dispute that the initial entry was unlawful and that that first gun that was found would be directly as a result of that illegal entry. And what happened was after all of the evidence came in, the trial court started the argument portion of the suppression hearing by giving a tentative ruling. And he said, I think that the initial entry was unlawful and that the pistol would be suppressed, but that I think that the rest of it was sufficiently attenuated. And then there were some other issues they discussed, too. So then both counsel addressed that tentative ruling. So the illegal entry, I think, was clear to everyone based on the case law, based on the Payton case. So that was really never in dispute. And that's how the argument was in response to that tentative ruling. I have nothing further on the other issues if the Court ñ and I don't know if the Court would like the supplemental excerpts of record. If so, I'm happy to have a copy today and send it to everyone. I think we can order it from the district court if we need it. Usually we do. It's Volume I of the Reporter's Transcript on Appeal. Thank you. Well, it's rare that you see this kind of conflict, and so I invite you to look at the transcript. I'm sorry. I didn't realize Judge Nelson had a question before I let you sit down. Oh, okay. Thank you. Every time I get up here, I make some sort of a mistake. Let me make two points if the Court will. One is on page 35 of my brief, I indicate the Reporter's Transcript where Rickman said when he spotted the .25 caliber and seized it, he also spotted the black cap with holes in it, black gloves, and jacket. It's an RT-101, RT-102. And also let me point out to the Court where, again, these are questions by the prosecutor. The trial counsel didn't do anything. And here in question by the trial court, Mercado testifies that when he got there, he received the consent, as we've indicated, by presenting the .25 caliber pistol. And he asked him what happened then. He said, well, they froze the room. And when I finished with Ms. Pitts, they brought me up to date that there was a .223 rifle, a Mesulite. So you went in there. They discovered things without moving them. Yes, we were waiting for a technician, one, to recover the weapons, and two, to photograph. This is on my brief, page 37, RT-130. I just want to make sure the Court understands I'm not making this up out of whole cloth. And the other thing I'd like to bring to your attention is this fact that it was argued, this kind of interesting argument, that Ms. Pitts was happy to give her consent. She actually was happy to give her consent because she was confronted with the illegally seized .25 caliber pistol. She said, guns shouldn't be in my apartment. You've seized this weapon. I want you to search my apartment. That's why she gave consent. That's exactly why she gave consent. I agree. But this is a pretty steep hill, though, with, you know, that the trial court heard from the witness and decided that she wasn't coerced. How do you get, you know, how do we get past that? Well, you get past that because the trial court. I mean, those are all good arguments to make to the judge that's making that. But they weren't made. I guess what I'm trying to tell you, they weren't made. I circled what my trial counsel said. Well, I don't know how to respond. That's what he said. And everybody else was the prosecutor and the trial court talking. It was the prosecutor that mentioned everything. I mean, the prosecutor was amazing in the case of the hearing. The trial court didn't do anything. And my point is that these arguments that I'm making to you or if I made these arguments to Judge Valachi, it would all be suppressed. But, again, I want to point out to you that he didn't just suppress the .25 caliber pistol. He said, and any other evidence seized as a result of the observations of Officer Rickman and Midget. And then the prosecutor said, well, that was only the .25 caliber pistol. That's not true. You read the transcript. It's not true. So he had the facts wrong. It was unreasonable. And he also applied the attenuation analysis wrong. He didn't even apply it. And the most important part of that attenuation analysis is the fragrance, the flagrant aspect. The cops went in there with guns drawn and they were unapologetic about it. That's something that you have to keep in mind. Just think of your house at 5 in the morning, roused out of bed, put on the living room floor, and all the males on camp got and kept that way while the cop showers to get there. That's what happened in this case. And then in terms of attenuation and interviewing the circumstances. I need to wind up your overtime at this point. I'm sorry. I thought I was going down. No. You're going up. Thank you. Thank you for your argument. This matter will stand submitted. Thank you.
judges: Goodwin, D.W. Nelson, Callahan